An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-956

NORTH CAROLINA COURT OF APPEALS

Filed: 3 June 2014

STATE OF NORTH CAROLINA

v.                                    Halifax County
                                      Nos. 12 CRS 051587, 001797
TONY LINWOOD MARTIN, JR.


Appeal by Defendant from judgment entered 22 March 2013 by Judge J. Carlton Cole in Halifax County Superior Court. Heard in the Court of Appeals 23 January 2014.

>   *Attorney General Roy A. Cooper, III, by Deputy Director Attorney General Caroline Farmer, for the State.*
>
>   *Irons & Irons, P.A., by Ben G. Irons II, for Defendant-appellant.*


DILLON, Judge.


Tony Linwood Martin, Jr. ("Defendant") appeals the 22 March 2013 judgment following a jury trial convicting him of obtaining property by false pretense and exploitation of an elder or disabled adult. Defendant argues the trial court erred in (1) denying his motion to dismiss, (2) admitting testimony from the victim regarding an incident a week before trial, and (3)

admitting opinion testimony from the victim's daughter. We find no error as to Defendant's conviction for obtaining property by false pretenses but find error in Defendant's conviction for exploitation of an elder or disabled adult. Because the convictions were consolidated for sentencing, we vacate the judgment and remand for entry of judgment consistent with this opinion.

I. Factual & Procedural History

On 6 August 2012, Defendant was indicted for obtaining property by false pretenses and exploitation of an elder or disabled adult. Beginning 18 March 2013, a trial was held in Halifax County Superior Court, the Honorable J. Carlton Cole presiding. The State's evidence at trial tended to show the following: Faye Pierce ("Ms. Pierce") was born in 1937 and moved to Roanoke Rapids in 1957. She lived on Bolling Road in Roanoke Rapids from 1957 until her husband passed away in January 2010. After her husband passed away, she bought a house at 103 Steeplechase Run, just across the street from the home of her daughter, Wanda Cooke ("Ms. Cooke").

Ms. Pierce's husband started a plumbing business ("Pierce's Plumbing") in 1977 where Ms. Pierce worked beginning in the 1980s. At the time of trial, Ms. Pierce still worked in that

business, answering the telephones and making out a "work list" for the employees. Pierce's Plumbing was located at the Bolling Road home. Ms. Pierce did not handle the bookkeeping or financial responsibilities of the business.

When Ms. Pierce bought the house at 103 Steeplechase Run, she hired Defendant to assist in decorating the house. Defendant took about a year to complete the work on Ms. Pierce's home. Ms. Pierce paid Defendant each time he asked her to pay, although Defendant did not provide invoices for his work or receipts for items he purchased for her home.

After finishing the work on Ms. Pierce's house, Defendant asked Ms. Pierce for a $40,000 loan. Ms. Pierce loaned him the money. Ms. Cooke testified that she found out about the $40,000 loan and called Defendant, telling him to pay her mother back. Defendant repaid the loan.

From April 2011 to September 2011, Ms. Pierce made a series of loans to Defendant totaling $60,000. Defendant filled out the check for each loan, as Ms. Pierce could not see well enough to write them, and Ms. Pierce signed the checks. During the time period Ms. Pierce loaned this money to Defendant, Defendant paid back $2,000.

When Defendant took out loans from Ms. Pierce, he wrote her checks from an account labeled "Martin Interiors" and said he would tell her when to cash them as repayment for the loans. Ms. Pierce believed she would be able to cash the checks at some point, and she felt more comfortable loaning Defendant money because she thought he was going to pay her back. However, Defendant never informed Ms. Pierce that the checks were from an account that had been closed.

Ms. Pierce made another series of loans to Defendant from October 2011 to February 2012 totaling $93,000. Defendant paid Ms. Pierce $1,000 on 20 January 2012 and another $1,000 on 1 February 2012, both by check. These two checks were drawn on a different bank than the "Martin Interiors" checks, and Ms. Pierce was able to cash them. Ms. Pierce loaned Defendant an additional $8,000 on 1 March 2012.

Ms. Pierce put the "Martin Interiors" checks Defendant gave to her in a drawer in her bedroom. Sometime around March 2012, there was a break-in at the Bolling Road location, and Ms. Cooke came to the home to help clean up. Ms. Cooke found the "Martin Interiors" checks written to her mother and called the police.

Ms. Cooke testified that she had become a cosigner on her mother's personal accounts when her father died because her

mother was "not really a very financial-minded person. She has never really had to deal with any kind of numbers or anything. My dad always took care of everything."

Ms. Cooke testified to her opinion that Ms. Pierce is not able to safeguard her resources, particularly financial resources. Ms. Cooke went on to say that Ms. Pierce does not know how to balance a bank statement, does not know how to use a calculator, and "is not strong with numbers."

Ms. Cooke's husband, Charles Ray Cooke ("Mr. Cooke"), also testified at trial. Mr. Cooke testified that after he became aware of the initial $40,000 loan to Defendant by Ms. Pierce, he told Defendant not to ask for another loan from Ms. Pierce. Mr. Cooke testified that, in his opinion, Ms. Pierce was "not able to deal with the type of finances that she has to deal with on a weekly basis."

Gerardo Maradiaga ("Dr. Maradiaga"), an internal medicine physician at Halifax Medical Specialists, testified that he had been treating Ms. Pierce for ten years. He testified that during that time, Ms. Pierce had anxiety and depression. Dr. Maradiaga said that Ms. Pierce's visual problems triggered stress for her, as did the money she inherited after her husband died.

After Dr. Maradiaga's testimony, the State recalled Ms. Pierce to testify about an incident that happened the Friday before trial. Ms. Pierce was at the bank that Friday and saw Defendant, who was taking pictures of her with his camera. Defendant followed her out to her car and continued taking pictures of her, even after she pulled out of the parking lot. Ms. Pierce testified that she felt intimidated and frightened.

James Thomas Bolton testified that he had worked at Pierce's Plumbing with Ms. Pierce and her late husband for 27 years. He testified that Ms. Pierce "can't count money right. She'll ask me questions, like on a plumbing bill she'll look right on the paper and see how much it is, but she'll ask me how much has she got to pay." He testified that Ms. Pierce's difficulty with money was getting worse.

Defendant made a motion to dismiss at the close of the State's evidence, which the trial court denied.

Defendant testified on his own behalf. He testified that he wrote the "Martin Interiors" checks from his closed account as "IOUs" and that he told Ms. Pierce the account was closed. The checks he gave her, however, had less value than the amount he borrowed. He gave her those checks in August and September of 2011. Each one was postdated, with dates ranging from

September 2011 to February 2012. Defendant said they agreed that he would start paying in the new year, which is why he made the two $1,000 payments in early 2012. He testified that he intended to repay Ms. Pierce the entire amount owed. Defendant testified that on the Friday before trial, he took photos of Ms. Pierce at the bank because he wanted to prove that she is able to conduct business by herself. Defendant moved to dismiss again at the close of all the evidence, and the trial court again denied his motion to dismiss.

On 22 March 2013, the jury found Defendant guilty of obtaining property by false pretenses and guilty of exploitation of an elder adult. Defendant was sentenced to a minimum of 16 and a maximum of 20 months imprisonment. Defendant gave oral notice of appeal at trial.

## II. Analysis

On appeal, Defendant argues that the trial court erred by (1) denying his motions to dismiss, (2) admitting testimony from Ms. Pierce concerning the incident at the bank, and (3) admitting opinion testimony from Ms. Cooke.

### A. Motions to Dismiss

Defendant first argues that the trial court should have granted his motions to dismiss because the State did not provide sufficient evidence of the essential elements of the crimes.

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (citation and quotation marks omitted). "'Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.'" *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (quotation marks and citation omitted), *cert. denied*, 531 U.S. 890, 148 L. Ed. 2d 150 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980) (citation omitted). "In making its determination, the trial court must consider all evidence admitted, whether competent or

incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994) (citation omitted), *cert. denied*, 515 U.S. 1135, 132 L. Ed. 2d 818 (1995).

1. Obtaining Property by False Pretenses

Defendant argues that there is no evidence of a false representation or an intent to deceive Ms. Pierce and that "the State's evidence only proves that [Defendant] accepted loans from the alleged victim and did not pay them back."

The elements of obtaining property by false pretenses are "(1) a false representation of a subsisting fact or a future fulfillment or event, (2) which is calculated and intended to deceive, (3) which does in fact deceive, and (4) by which one person obtains or attempts to obtain value from another." *State v. Seelig*, ___ N.C. App. ___, ___, 738 S.E.2d 427, 431 (quotation marks and citation omitted), *disc. review denied*, 366 N.C. 598, 743 S.E.2d 182 (2013).

There is substantial evidence, however, that Defendant did make false misrepresentations and that he intended to deceive Ms. Pierce. Taken in the light most favorable to the State, Ms. Pierce signed checks to Defendant for more than $150,000 as

"loans." Defendant wrote checks from his "Martin Interiors" account to Ms. Pierce, saying that he would tell her when to cash them as repayments for the loans. Ms. Pierce believed she would be able to cash those checks at some point and felt more comfortable continuing to loan Defendant money based on these checks. The account the checks were written on was closed, however, and Defendant never told Ms. Pierce that the account was closed. "[W]hen a person obtains something of value by means of misrepresentations with intent to deceive the victim, the requisite intent to cheat or defraud exists." *State v. Cronin*, 299 N.C. 229, 242, 262 S.E.2d 277, 285 (1980). Defendant misrepresented to Ms. Pierce that she would be able to cash his checks at some point in the future when he knew the account on which the checks were drawn was closed.

Although Defendant presents a different version of the events, for purposes of a motion to dismiss we take the facts in the light most favorable to the State. *State v. McCoy*, 303 N.C. 1, 23-24, 277 S.E.2d 515, 531 (1981) ("Defendant's evidence may be considered insofar as it merely explains or clarifies or is not inconsistent with the [S]tate's evidence."). There is substantial evidence that Defendant made false representations to Ms. Pierce with the intent to deceive her, did in fact

deceive her, and obtained funds as a result of his misrepresentations.

2. Exploitation of an Elder Adult

Defendant argues that the trial court erred in denying his motions to dismiss the charge of exploitation of an elder adult, in part, because there was not substantial evidence that Ms. Pierce met the statutory definition of an "elder adult." "Elder adult" is defined in N.C. Gen. Stat. § 14-112.2. Under the version of G.S. 14-112.2 that is relevant to this case, an "elder adult" is defined as a person who is "60 years of age or older who is **_not_** able to provide for the social, medical, psychiatric, psychological, financial, **_or_** legal services necessary to safeguard the person's rights and resources and to maintain the person's physical and mental well-being." N.C. Gen. Stat. § 14-112.2(a)(2) (2011) (emphasis added).

Defendant contends that there is no dispute that the victim "was able to provide for her medical, psychiatric and psychological needs . . . . [but that] the only serious question is whether she could provide for her 'financial' needs." The State does not dispute Defendant's contention and only argues that it met its burden of proving that the victim was an "elder adult" by offering evidence that she could not provide for her

"financial" services.  During the hearing, the attorney for the State argued as follows:

> The State only has to prove that she is unable to safeguard her rights and resources with regard to any one of a number of things.  It could be legal.  It could be medical.  In this case it is financial.

However, we believe that the language of G.S. 14-112.2 requires that the State prove that the victim was not able to provide for each and every one of the services enumerated in the statute-- i.e., social, medical, psychiatric, psychological, financial, and legal--not just for one of them.  Though the use of the word "or" in a list typically suggests an interpretation that the list is to be read in the disjunctive, when the list is preceded by the word "not," the context may require that the list be read in the conjunctive.  For example, if a father tells his daughter that she is **_not_** to go to the movies **_or_** to the football game, he has communicated to her that she is not allowed to do either activity; that is, she may not go to the movies **_and_** she may not go to the football game.  However, if the father had told his daughter that she is **_not_** allowed to go to the movies **_and_** to the football game, he has stated that she may do one or the other, but not both of them.  In the discipline of logic, this interpretation is known as DeMorgan's Law, which provides, in

part, that the negation of a disjunction is the conjunction of the negatives; that is, "not (A or B)" is the same as "not A **_and_** not B". Applying DeMorgan's Law, we believe a reasonable reading--and, perhaps the better reading--of the statutory language requires the State to prove that the victim was not able to provide for her social services **_and_** she was not able to provide for her medical services **_and_** she was not able to provide for her psychiatric services, etc.

At best, the statutory language is ambiguous as to whether the State's burden is met by proving, as the State argues, that the victim is unable to provide for her financial services *only*, without any offering any evidence concerning the victim's ability to provide for her other services. However, even if the statute is ambiguous, the State's argument fails as it is well-settled that "[i]n construing ambiguous criminal statutes, we apply the rule of lenity, which requires us to strictly construe the statute." *State v. Hinton*, 361 N.C. 207, 211, 639 S.E.2d 437, 440 (2007).

Assuming, *arguendo*, that the statutory definition unambiguously requires the State prove that the victim was not able to provide for her financial services *only*, and not the other services enumerated therein, the State's argument still

fails. Specifically, the statutory definition also requires separately that to meet the statutory definition of "elder adult" it must be shown that the victim is unable "to safeguard [her] rights **_and_** resources **_and_** to maintain her physical **_and_** mental well-being." N.C. Gen. Stat. § 14-112.2(a)(2) (2011) (emphasis added). We believe that this part of the statute is to be read in the conjunctive since the word "and" is employed, without being preceded by the word "not." However, there is no evidence that the victim was not able to perform at least some of these tasks, such as caring for her physical well-being. In fact, she testified that she lived by herself, she drove herself places, she scheduled her own doctor appointments, and she shopped for herself.

We note that the statutory definition of "elder adult" was amended, effective for offenses committed after 1 December 2013, lessening the burden on the State. *See* 2013 N.C. Sess. Laws 337, § 1. Under the new statutory language, the State only need prove that the victim was 65 years of age or older, without any showing regarding her capabilities to provide for her services or perform certain tasks. *See id.* However, in the present case, the events giving rise to Defendant's conviction occurred prior to 1 December 2013, the effective date of the amendment;

and, therefore, the language in the amendment, which lessens the State's burden, does not apply. Accordingly, as the State failed to offer substantial evidence of the elements of the crime of exploitation of an elder adult, the trial court erred in denying Defendant's motions to dismiss as to this crime.

### B. Testimony From Ms. Pierce and Ms. Cooke

Defendant next argues the trial court erred under Rules 404(b), 403, 401, and 402 of our Rules of Civil Procedure in admitting testimony from Ms. Pierce regarding Defendant's taking photos of her at a bank days before the trial. Defendant also argues that the trial court erred in allowing Ms. Cooke to testify to her opinion that Ms. Pierce is unable to safeguard her financial resources. However, we need not address these arguments because, even assuming *arguendo* that the testimony was admitted in error, Defendant argues that they prejudiced him in regard to his defense to the crime of exploitation of an elder adult. As determined above, we found error in the trial court's denial of Defendant's motion to dismiss this charge and this conviction will properly be vacated on remand.

### III. Conclusion

For the foregoing reasons, we find no error in Defendant's conviction for obtaining property by false pretense but find

that the trial court erred in denying Defendant's motion to dismiss the charge of exploitation of an elder adult. As the trial court consolidated the convictions for sentencing, we vacate the trial court's judgment, and remand for entry of judgment consistent with this opinion.

NO ERROR in part; VACATED AND REMANDED in part.

Judge STROUD concurring.

Judge HUNTER, JR. concurring in part; dissenting in part in a separate opinion.

Report per Rule 30(e).

NO. COA13-956

NORTH CAROLINA COURT OF APPEALS

Filed: 3 June 2014

STATE OF NORTH CAROLINA

    v.

TONY LINWOOD MARTIN, JR.

Halifax County
Nos. 12 CRS 051587, 001797


        HUNTER, JR., Robert N., Judge, concurring in part and dissenting in part.

        I dissent from the majority's narrow interpretation of the definition of an "elder adult."  I would hold that Ms. Pierce meets the definition of an "elder adult" and would thus hold the trial court committed no error as to Defendant's conviction for exploitation of an elder adult.

        An "elder adult" is defined as "[a] person 60 years of age or older who is not able to provide for the social, medical, psychiatric, psychological, financial, *or* legal services necessary to safeguard the person's rights and resources and to maintain the person's physical and mental well-being."  N.C. Gen. Stat. § 14-112.2(a)(2) (2011) (emphasis added).  The majority applies an analysis using DeMorgan's Law, a rule of inference relating to conjunctions, interpreting the statute to mean that a person who is able to provide for even one of the

services listed in the definition would not be an "elder adult."
I believe this is a misinterpretation of the statute.

In construing the definition of "elder adult," we turn to our established methods for statutory construction.

> In matters of statutory construction, our primary task is to ensure that the purpose of the legislature, the legislative intent, is accomplished. Legislative purpose is first ascertained from the plain words of the statute. Moreover, we are guided by the structure of the statute and certain canons of statutory construction. Courts also ascertain legislative intent from the policy objectives behind a statute's passage "and the consequences which would follow from a construction one way or another." "A construction which operates to defeat or impair the object of the statute must be avoided if that can reasonably be done without violence to the legislative language." An analysis utilizing the plain language of the statute and the canons of construction must be done in a manner which harmonizes with the underlying reason and purpose of the statute.

*Elec. Supply Co. of Durham, Inc. v. Swain Elec. Co., Inc.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991) (internal citations omitted). Although we look first to the "plain words of the statute," rules of logic are not included in the "plain words." To hold that rules of logic are part of a "plain language" analysis without regard to legislative intent or purpose could have severe unintended consequences, stripping statutes of their

efficacy by blindly applying mathematical rules. Instead, I would hold that rules of logic are only one part of statutory construction and are not a part of a "plain words" analysis.

Under our rules of statutory construction, we look to the "consequences which would follow from a construction one way or another." *Id.* (quotation marks and citation omitted). Under the majority's analysis, in order to prove exploitation of an elder adult, the victim would have to be incapable of providing for her social needs, incapable of providing for her medical needs, incapable of providing for her psychiatric needs, incapable of providing for her psychological needs, incapable of providing for her financial needs, and incapable of providing for her legal needs. Requiring a person to be incapable of providing for services in all six areas would limit the definition to those who are completely unable to function for themselves, a scarce population. This limitation on victims would "defeat or impair the object of the statute" prohibiting exploitation of an elder adult, and such a construction "must be avoided." *Id.* (quotation marks and citation omitted).

It is reasonable to ascertain that the original statute meant to include anyone in the definition of "elder adult" that was unable to provide for services necessary to safeguard their

resources in one of the six areas listed. This interpretation is in line with the underlying purpose of the statute to protect elder adults who are unable to protect themselves. Although the majority cites the rule of lenity as requiring a narrower interpretation, that rule "does not require that words be given their narrowest or most strained possible meaning. A criminal statute is still construed utilizing 'common sense' and legislative intent." *State v. Beck*, 359 N.C. 611, 614, 614 S.E.2d 274, 277 (2005) (internal citation omitted).

Ms. Pierce was more than 70 years old at the time of Defendant's actions. There was substantial testimony that Ms. Pierce could not handle her own financial resources from Ms. Pierce herself, her daughter Ms. Cooke, her son-in-law Mr. Cooke, and Pierce's Plumbing employee James Bolton. In addition, Ms. Pierce's physician testified to her anxiety and depression, explaining that the money she inherited was a trigger for stress to Ms. Pierce. The record provides substantial evidence that Ms. Pierce was unable to safeguard her financial resources and meets the definition of an "elder adult." I would therefore find no error in the trial court's decisions.